IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ADRIAN SINGLETARY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:19-cv-00151-O |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant United States of America's Motion for Summary Judgment (ECF No. 21). Having considered the motion, briefing, and applicable law, the Court finds that the United States of America's Motion for Summary Judgment should be and is hereby **GRANTED.** Accordingly, Plaintiff Adrian Singletary's ("Singletary") medical malpractice claims against the United States are hereby **DISMISSED with prejudice.**

**BACKGROUND**

Singletary entered Bureau of Prisons custody on November 2, 2016, at the Detention Center at USP Atlanta. Def.'s App. Supp. Mot. Summ. J Ex. 1 at 1–14, ECF No. 23. A detailed physical was conducted one week later, on November 9, 2016. *Id.* Singletary reported that he had hypertension, and a 26-year history of smoking around a quarter of a pack of cigarettes per day. *Id.* at 1, 6. His family medical history included various instances of hypertension and cardiovascular disease. *Id.* at 6. Singletary's blood pressure reading

was 123/100, but it was noted that he had not taken his blood pressure medications that day. *Id.* at 5, 12.

The day following his physical, on November 10, 2016, Singletary was seen in the Health Services department at USP Atlanta complaining of chest pains and symptoms of a heart attack. *Id.* at 15. Singletary's medical records indicate that he began feeling chest pain at 4:00 a.m. that morning and the pain progressively intensified until he sought medical assistance at around 12:00 in the afternoon. *Id.* Singletary received two doses of Nitroglycerin and 325 mg of aspirin, but his chest pain persisted. *Id.* at 16. An ECG was administered, which yielded abnormal results. *Id.* at 15. That same day Singletary was sent to a local hospital, Atlanta Medical Center, for further evaluation and treatment.

The medical records from Atlanta Medical Center reflect that Singletary reported "a strong family history for early onset heart disease." *Id.* at 20. Singletary, who was 44 years old at the time, reported that his father died at age 49 of heart disease, his brother had mitral valve surgery twice, and his cousin died at age 35 of heart disease. *Id.* Singletary's medical records from Atlanta Medical Center indicate that specialists found several medical problems with the left ventricle of his heart, including dilation, hypertrophy, diastolic dysfunction, global hypokinesis, lowered ejection fraction. *Id.* at 27. His testing at Atlanta Medical Center also showed mild enlargement of the right ventricle, and moderate left atrial enlargement. *Id.* The outside clinicians determined he had chest pains and NSTEMI or non-STEMI, a type of heart attack in which there is narrowed but not complete blockage of an artery. *Id.* at 30.

On November 11, 2016, Singletary received a left heart cardiac catheterization at the hospital with no stents placed. *Id.* at 32–33. Radiological testing did not reveal any acute cardiac issues, and Singletary was not considered a good candidate for surgery. *Id.* at 20. Singletary's condition was stabilized, so he was discharged from Atlanta Medical Center on November 14, 2016, and returned to USP Atlanta the same day, with a number of prescriptions for heart and blood thinning medications, including aspirin (blood thinner), Atorvastatin (cholesterol and triglycerides), Lorsartan (blood pressure), Nitroglycerin (chest pain), Carvedilol (blood pressure), and Ducosate (laxative). *Id.* at 33, 36. The outside specialists recommended Singletary be evaluated for possible cardiovascular surgery, and also that he begin aggressive risk factor modification and medical therapy, including dietary changes. *Id.* at 28, 33.

Singletary was re-designated to a Bureau of Prisons Medical Referral Center which cares for inmates with more serious medical problems. *Id.* at 38, 40. He transferred to FMC Devens, Massachusetts, leaving USP Atlanta on January 5, 2017, and staying in several in-transit centers before arriving at FMC Devens on January 12, 2017. *Id.* A health care intake assessment and evaluation were completed, and Singletary continued using the following medications for his cardiovascular issues: Atorvastatin, Carvedilol, Losartan, Lasix, Spironolactone, with Tordal, Metaprolol and Imdur introduced. *Id.* at 42–49. During his 5-month stay at FMC Devens, Singletary was seen and treated for his heart conditions both by medical providers at FMC Devens and outside providers. *See, e.g.*, *id.* at 42–68. Even so, his blood pressure readings at FMC Devens were mostly in the Elevated Normal to Hypertension Stages I and II, with a short period in February through early April 2017 in

3

which Singletary's blood pressure readings were consistently in the normal range. *See, e.g.*, *id.* at 45, 57, 68.

Singletary transferred out of FMC Devens on June 23, 2017, was held in several in-transit facilities, and arrived at FMC Fort Worth on July 6, 2017. Singletary underwent a detailed initial medical assessment by a registered nurse at FMC Fort Worth. *Id.* at 69–74. He presented as a Care Level III medical designee with a history of possible NSTEM, atypical angina, hypertension, hyperlipidemia (high fat particles or lipids in blood), Raynaud's Syndrome (numbness in some body areas due to limited blood supply), sleep apnea. *Id.* On July 10, 2017, the staff physician performed a detailed assessment, noting that it was not entirely certain that Singletary suffered an NSTEM on November 10, 2016, but it may have been myocarditis or an inflammation of the middle layer of the heart wall resulting possible takotsubo variant or weakening of the heart muscle. *Id.* at 77–85. The physician determined that Singletary should continue with Imdur, Topral, and Atorvastatin, and have an echocardiogram and cardiology consultation in a year, for his cardiovascular issues and to follow his moderate mitral regurgitation and mitral valve prolapse. *Id.* at 82. Singletary was also continued on aspirin and Nitroglycerin, Isosorbide mononitrate (for chest pain). *Id.*

Singletary was seen in the clinic at FMC Fort Worth by a staff physician on August 17, 2017, for chest pressure with no associated pain he experienced while sitting outside in hot weather playing the guitar. *Id.* at 86. His heart rhythm was found to be normal and Singletary was oriented and not in distress. *Id.* at 86–87. The symptoms resolved without treatment in about 30 minutes and Singletary was sent to his housing unit to rest,

with instructions to go to sick call or seek medical assistance if the symptoms returned. On January 11, 2018, Singletary was seen by a contract cardiologist. *Id.* at 114. The cardiologist noted Singletary was supposed to be taking hypertension drugs Losartan and Carvedilol, but he was taking them incorrectly, and he was prescribed Imdur, but was not taking it at all. *Id.* He recommended Singletary stop being prescribed Imdur, take Plavix 75 mg as a blood thinner, and an echocardiogram to be done in his office with follow-up. *Id.* The BOP physicians followed these recommendations. *Id.* at 110.

Singletary was evaluated in Health Services on March 31, 2018, for complaints of being unable to see out of his left eye. *Id.* at 116. He had a blood pressure reading of 143/94, and the documented medical assessment recorded that Singletary's left eye was unreactive to light and not related to any injury, but otherwise normal. *Id.* Singletary was sent to an outside emergency room immediately after this assessment and was admitted. *Id.* at 117. He was examined by an outside ophthalmologist on April 1, 2018, who found a "breach retinal artery occlusion, left eye." *Id.* at 124–125. The specialist stated that hypertension was the most likely underlying cause, but recommended checking Singletary's lipid panel and A1c levels. *Id.* at 125. The April 2, 2018, hospital discharge summary stated "Left eye vision less due to left eye retinal artery breach occlusion. Uncontrolled hypertension." *Id.* at 119. It also explained that the initial suspicion of a stroke was ruled out. *Id.* at 120. An MRI was conducted which found possible small vessel ischemic disease, but it could not rule out other causes of the occlusion. *Id.* at 125. The hospital staff recommended Singletary continue to take his hypertension and other medications and be followed up by an ophthalmology specialist in the future, which was scheduled. *Id.* at 121.

Singletary saw a physician at FMC Fort Worth on the morning of April 3, 2018, with complaints of left chest pain, radiating into his arm. *Id.* at 139–140. He was immediately sent to an outside hospital for further evaluation. On April 4, 2018, Singletary had a left heart catheterization, coronary angiogram, and a stent placed in his heart. *Id.* at 155. Singletary had a cardiology consultation with a specialist on July 19, 2018, and he reported having daily chest pain and elevated blood pressure. *Id.* at 160. The reading in the office was 143/100. *Id.* The cardiologist recommended Singletary's Losartan be increased, continue aspirin and Plavix, lipid panel, and a follow up echocardiogram. *Id.* Despite various changes and adjustments to his medications by BOP and outside physicians, Singletary's vital sign records from FMC Fort Worth show his blood pressure to have been mostly in the Elevated Normal to Hypertension Stages I and II.

## LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine dispute as to any material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986); FED. R. CIV. P. 56(c).

6

When reviewing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id*. at 250.

## ANALYSIS

Singletary's claims against the United States are governed by the Federal Tort Claims Act ("FTCA"). In the FTCA, Congress waived the United States' sovereign immunity for claims arising from certain torts committed by federal employees. *See* 28 U.S.C. §§ 1346(b)(1), 2671–2680; *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217–18 (2008). As the Supreme Court has explained:

> The FTCA gives federal district courts jurisdiction over claims against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Sheridan v. United States*, 487 U.S. 392, 398 (1988) (quoting 28 U.S.C. § 1346(b)).

To determine the substantive legal rules applicable to an FTCA plaintiff's claim, the FTCA essentially borrows from state law in that it allows the United States to be held liable for allegedly tortious conduct "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Singletary complains of alleged medical

7

malpractice occurring at a Federal Bureau of Prisons facilities in Georgia and Texas, so the laws of those states applies. *See Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985) ("Under the [FTCA], liability for medical malpractice is controlled by state law.").[1]

Texas "health care liability claims are subject to strict pleading and proof requirements." *N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 561 (5th Cir. 2008) (citing TEX. CIV. PRAC. & REM. CODE §§ 74.001–.507). A plaintiff in a malpractice action "bears the burden of proving (1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation." *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008). The plaintiff must establish the standard of care as a threshold issue before the factfinder may consider whether the defendant breached that standard. *Id.* Unless the mode or form of treatment is a matter of common knowledge or is within the experience of a lay person, expert testimony is required to prove the applicable standard of care as well as its breach. *See id.* at 601–02; *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). Expert testimony is also required to show that the breach proximately caused the harm suffered. *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005). In short, subject to the narrow exception for matters of common knowledge, a plaintiff must produce expert testimony to meet his burden of proof on a malpractice claim. *Hannah*, 523 F.3d at 601; *see also Prindle v. United*

---

[1] As is true under Texas law, Georgia law recognizes a presumption that medical care was performed in an ordinarily skillful manner. *Shea v. Phillips*, 98 S.E.2d 552, 554 (Ga. 1957). A plaintiff must use expert testimony to establish proximate cause, *Zwiren v. Thompson*, 578 S.E.2d 862, 864 (Ga. 2003), and "may not rely on his own statements and lay opinions to avoid summary judgment." *Suggs v. United States*, 199 F. App'x 804, 808 (11th Cir. 2006).

*States*, No. 4:10-CV-54-A, 2011 WL 1869795, at *1–2 (N.D. Tex. May 13, 2011) (holding that expert testimony is required to establish the standard of care with respect to a FTCA claim that medical personnel were negligent in failing to diagnose and treat carcinoma); *Woods v. United States Gov't*, No. 3:08-CV-1670-D, 2010 WL 809601, at *3 (N.D. Tex. Mar. 8, 2010) (holding that expert testimony is necessary to establish the standard of care with respect to an FTCA claim that a VA doctor committed medical malpractice by prescribing a cholesterol medication that interacted with the plaintiff's diabetes and liver disease).

In this case, Singletary has not designated any experts and has not provided expert opinion stating the standard of care for an injury such as his, or for any matters relating to post-surgical rehabilitation, or that there was any breach of an applicable standard of care which caused him injury. Singletary also has not shown that the medical standard of care, and the issues of breach and causation regarding the treatment of the medical conditions detailed in his pleadings, are matters of common knowledge or within the general experience of a lay person, so as to excuse the requirement to provide evidence in the form of expert testimony. Texas law only excuses the requirement for expert testimony in cases of truly rare, obvious forms of negligence. The Texas Supreme Court has given as examples "negligence in the use of mechanical instruments, operating on the wrong portion of the body, or leaving surgical instruments or sponges within the body." *Haddock v. Arnspiger*, 793 S.W.2d 948, 951 (Tex. 1990). Singletary has not identified any such acts in this lawsuit.

Singletary entered into BOP custody with a strong family history of early onset heart disease and hypertension. And as the complaint and the materials in the government's summary judgment appendix make clear, Singletary was evaluated and treated continuously by BOP medical staff, and routinely sent for consultations and treatment by contract physicians and outside hospitals to address his medical issues. His belief, however sincere, that the BOP should have somehow prevented his heart disease or taken additional measures on top of the multiple medications and recommended lifestyle changes to correct hypertension that was refractory to care, does not establish negligence on the part of the BOP. Texas law requires Singletary to provide expert testimony as to the standard of care for treating refractory hypertension and heart disease, any applicable breach thereof, and any causal connection between the alleged negligence and the alleged injury. Accordingly, without the support of expert testimony, Singletary's medical malpractice claims fail as a matter of law. *See Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977). Therefore, summary judgment is **GRANTED** in favor of the United States and Singletary's claims are **DISMISSED with prejudice.**

## CONCLUSION

For the foregoing reasons, the Court finds that Defendant's Motion for Summary Judgment (ECF No. 21) should be and is hereby **GRANTED.** Accordingly, Singletary's claims against the United States are hereby **DISMISSED with prejudice.** Any scheduled hearings are hereby **CANCELLED.**

**SO ORDERED** on this **24th day** of **August, 2020**.

_/s/ Reed O'Connor_
Reed O'Connor
UNITED STATES DISTRICT JUDGE